**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MAXIM CRANE WORKS, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-3667 |
| | § | |
| ZURICH AMERICAN | § | |
| INSURANCE COMPANY | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

In September 2018, Maxim Crane Works, LP sued Zurich American Insurance Company in Texas state court, alleging breach of contract and seeking a declaratory judgment that Zurich must reimburse Maxim for defense costs, a $3.5 million judgment, and other losses Maxim sustained in a related lawsuit. (Docket Entry No. 1-3). Zurich timely removed. (Docket Entry No. 1). The parties cross-moved for summary judgment, responded, and replied. (Docket Entry Nos. 20, 22, 25, 26, 29, 31).

Based on the motions, responses, and replies; the record evidence; and the applicable law, the court grants Zurich's summary judgment motion, (Docket Entry No. 22), and denies Maxim's summary judgment motion. (Docket Entry No. 20). Final judgment is entered by separate order.

The reasons for these rulings are detailed below.

## I. Background

### A. The Construction Project and Accident

In 2013, Skanska USA Building, Inc., a general contractor, was constructing an office campus in Houston and hired Berkel & Company Contractors as a subcontractor. (Docket Entry No. 19 at ¶¶ 1–3). Skanska had a contractor-controlled insurance program that included worker's

compensation coverage. (*Id.* at ¶ 4). Skanska required Berkel and other subcontractors to enroll and obtain coverage for the project. (*Id.*). Berkel enrolled and obtained coverage under the program effective from August to October 2013. (*Id.*). Berkel also had a separate commercial general liability policy with Zurich (the "Berkel Policy"), effective from August 2013 to August 2014. (*Id.* at ¶ 8).

Berkel leased a crane from Maxim for the project. (*Id.* at ¶ 5). Berkel's Lease Agreement with Maxim stated:

> THE EQUIPMENT IS RENTED TO LESSEE ON A **BARE RENTAL BASIS ONLY**, in its "As Is" condition. Lessee, at its own expense, shall transport, operate, inspect, maintain and repair the Equipment . . . . LESSEE IS RESPONSIBLE FOR ENSURING COMPLIANCE BY IT AND ITS EMPLOYEES/AGENTS, AND OF THE EQUIPMENT ITSELF, WITH ALL APPLICABLE LAWS, REGULATIONS AND ORDINANCES . . . . Lessor shall have no responsibility of any kind for compliance with any such laws, regulations or ordinances during the period the Equipment is in Lessee's possession or control.

(Docket Entry No. 19-1 at 514). Although Maxim had a separate Commercial General Liability policy with Zurich (the "Maxim Policy"), the Lease Agreement for the crane required Berkel to add Maxim as an additional insured under the Berkel Policy. (Docket Entry No. 19 at ¶¶ 7, 10; Docket Entry No. 19-1 at 514). The parties have stipulated that Maxim is an "Additional Insured" under the Berkel Policy. (Docket Entry No. 19 at ¶ 9). As an Additional Insured, Maxim was a "person or organization to whom or to which [Berkel is] required to provide additional insured status in a written contract or written agreement prior to the loss except where such contract or agreement is prohibited by law." (Docket Entry No. 19-1 at 617; *see* Docket Entry No. 19 at ¶¶ 6– 8). Maxim did not enroll in Skanska's contractor-controlled insurance program. (Docket Entry No. 19 at ¶ 4).

Later in 2013, a Berkel employee overtaxed the crane, causing it to fall over. Part of the crane fell on Tyler Lee, the project superintendent and a Skanska employee. (*Id.* at ¶ 11); *Berkel*

& Co. Contractors, Inc. v. Lee*, 543 S.W.3d 288, 293 (Tex. App.—Houston [14th Dist.] 2008).

Lee's leg was amputated. He received worker's compensation benefits through the contractor-controlled insurance program. (Docket Entry No. 19 at ¶¶ 11–12).

### B.    The State-Court Litigation

In 2014, Lee sued Berkel, Maxim, and other defendants in state court, alleging negligence and other state-law claims. (*Id.* at ¶ 13). When the state court litigation began, Maxim sought coverage from Zurich under the Berkel Policy as an Additional Insured, but Zurich denied coverage. (*Id.* at ¶ 14). Maxim also cross-claimed against Berkel for breach of contract, arguing that Berkel was required to defend Maxim and indemnify or contribute to any loss to Maxim. (*Id.* at ¶ 15).

In 2015, a jury awarded Lee more than $35 million in damages, allocating 90% of the fault to Berkel and 10% to Maxim. (*Id.* at ¶ 16). Maxim settled with Lee for $3,444,300.60, and Zurich paid Lee that amount under the Maxim Policy. (*Id.* at ¶ 17). Maxim reimbursed Zurich for $3,000,000 of the settlement costs, as required under the Maxim Policy's Deductible Endorsement. (*Id.*). Zurich also paid Maxim's defense costs under Maxim's individual policy, and Maxim reimbursed Zurich for the $824,839.38 Zurich paid in defense costs. (*Id.* at ¶ 19).

After the jury verdict, Maxim moved for entry of judgment on its cross-action against Berkel. (*Id.* at ¶ 18). The state trial court entered an amended final judgment in July 2015, stating that "Maxim is not entitled to reimbursement of Maxim's Defense Fees, Costs, and Expenses of and from Berkel," and rendered judgment in favor of Berkel in Maxim's cross action. (Docket Entry No. 19-2 at 169). The court later vacated that final judgment based on Berkel's objections and entered a new final judgment stating that "Maxim's motion for entry of judgment is denied, and Maxim takes nothing on its claims against Berkel." (*Id.* at 189).

In September 2015, Berkel appealed. (Docket Entry No. 19 at ¶ 20). In 2018, the Texas court of appeals reversed the judgment against Berkel, concluding that because Berkel and Skanska were covered under the contractor-controlled insurance program, "Skanska is Berkel's statutory employer" under the Texas Workers' Compensation Act and "Lee, as Skanksa's actual employee, is Berkel's co-employee." *Berkel & Co. Contractors*, 543 S.W.3d at 296. Because Skanska was immune under the Act's exclusive-remedy provision, Berkel, as a "co-employee," was also immune. *Id.*

Maxim also appealed the state-court judgment. (Docket Entry No. 19 at ¶ 22; Docket Entry No. 19-4 at 125–72). The Texas appellate court concluded that Maxim had "not preserv[ed] error as to its issues regarding the applicability of [the Texas Anti-Indemnity Act]," and the Texas Supreme Court denied review. *Maxim Crane Works, L.P. v. Berkel & Co. Contractors, Inc.*, No. 14-15-00614-CV, 2016 WL 4198138, at *2 (Tex. App.—Houston [14th Dist.] Aug. 9, 2016).

Maxim again demanded that Zurich cover its defense and settlement costs under the Berkel Policy. Zurich denied coverage because the Texas Anti-Indemnity Act prohibited Maxim's additional-insured coverage under the Berkel Policy. (Docket Entry No. 19 at ¶ 24; Docket Entry No. 19-4 at 261–62). This lawsuit followed.

### C. The Federal-Court Litigation

In September 2018, Maxim sued Zurich in state court, seeking coverage under the Berkel Policy. (Docket Entry No. 1-3). Zurich timely removed, and the parties agreed to file cross-motions for summary judgment with a joint stipulation of facts because the disputed issue is one of law. (*See* Docket Entry Nos. 1, 13).

## II.     The Legal Standard for Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 610 (5th Cir. 2018) (quotations omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating'" that "there is an issue of material fact warranting trial." *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). The moving party must demonstrate the absence of a genuine issue of material fact, but it need not need to negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). "If the moving party fails to meet [its] initial burden, [the summary judgment motion] must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie*

*v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La, L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

## III.    Issue Preclusion

Zurich moved for summary judgment that issue preclusion, or collateral estoppel, bars Maxim's claim because Maxim litigated the same coverage claim in state court. (Docket Entry No. 22 at 18–20). In its reply, Zurich explains that it "has reviewed the pleadings from the Underlying Lawsuit in conjunction with Maxim's collateral estoppel response argument" and "is withdrawing its collateral estoppel defense." (Docket Entry No. 29 at 4). Because Zurich has abandoned this argument, the court need not address it.

## IV.    Standing

While Maxim argues that it is entitled to recover under the Berkel Policy because it named Maxim as an Additional Insured, Zurich's standing argument focuses on Maxim's separate policy with Zurich, the Maxim Policy. Zurich argues that Maxim does not have standing to assert its claims because the Maxim Policy "includes a [d]eductible endorsement that effectively assigns Zurich the very claims that Maxim is asserting against Zurich." (Docket Entry No. 22 at 11).

The Maxim Policy requires Maxim to reimburse Zurich for all defense costs, including the first $3 million of any settlement or judgment. (Docket Entry No. 19-1 at 669). According to

Zurich, the Maxim Policy's Deductible Endorsement assigns all rights of recovery to Zurich. (Docket Entry No. 22 at 11, 20–27). The Deductible Endorsement states:

> [Zurich has] your rights and the rights of persons entitled to the benefits of this insurance to recover sums that are reimbursable under this endorsement and any Deductible Amount from anyone liable for the injury or damages. You will do everything necessary to protect those rights for us and to help us enforce them.
>
> If we recover any payment made under this policy from anyone liable for injury or damages, the recovered amount will first be applied to any payments made by us in excess of the Deductible Amount. The remainder of the recovery, if any, will then be applied to reduce the Deductible Amount reimbursed or reimbursable by you as respects that injury or damages.

(Docket Entry No. 19-1 at 673). The section further explains that the policy applies:

> irrespective of the application of any Deductible Amount(s), including those with respect to . . . [Zurich's] right and duty to investigate or defend the insured against any "suits" seeking those damages; and . . . [Maxim's] duties in the event of a claim or circumstances likely to result in a claim.

(*Id.* at 673–74). The parties' duties under the Deductible Endorsement "may continue after this policy expires or is cancelled." (*Id.* at 674). The parties agree that Pennsylvania law applies to the Maxim Policy. (Docket Entry No. 22 at 24 n.13; Docket Entry No. 25 at 16 n.7).

The jury in the underlying litigation awarded Lee actual damages of $35,443,006.00 and placed 10% of the fault on Maxim. (Docket Entry No. 19-2 at 11–26). Maxim later settled with Lee for $3,444,300.60. (Docket Entry No. 19 at ¶ 17). Zurich paid this settlement amount, and Maxim reimbursed Zuirch $3,000,000 under the Deductible Endorsement to the Maxim Policy. (*Id.*). Zurich billed Maxim $824,839.38 in defense costs, which Maxim paid. (*Id.* at ¶ 19).

Zurich argues that the assignment under the Deductible Endorsement "includes claims against Berkel and its insurer," Zurich. (Docket Entry No. 22 at 22). According to Zurich, the Deductible Endorsement unambiguously gives Zurich the exclusive right to recover reimbursable sums under the Maxim Policy. (*Id.*). Maxim responds that Zurich's construction overlooks the

distinction between "reimbursable" and "reimbursed" expenses and that the Deductible Endorsement's assignment provision does not apply once the insured, Maxim, has reimbursed the insurer, Zurich. (Docket Entry No. 25 at 15–20).

Zurich relies on *Zurich American Insurance Co. v. Wausau Business Insurance Co.*, No. 16-CV-3643, 2018 WL 4684112 (S.D.N.Y. Sept. 28, 2011), to support its interpretation of the Deductible Endorsement. (Docket Entry No. 22 at 22–25). In the *Wausau* case, Zurich and a contracting company that had overseen and coordinated the construction of a shopping center sought a declaratory judgment that Wausau was obligated to defend and indemnify the shopping-center's owners in an underlying personal-injury case. *Wausau*, 2018 WL 4684112 at *1. Zurich defended the owners as additional insureds under a Zurich insurance policy issued to contracting company. That policy included a deductible endorsement materially identical to the one in the Maxim Policy. *See id.* at *2. Wausau argued that the contracting company lacked standing because it had assigned its right to sue Wausau under the policy. *Id.* at *5. The Southern District of New York agreed, concluding that the "provision in the Zurich Policy is clear and unambiguous" in assigning the contracting company's rights to Zurich. *Id.* at *6. The court concluded that the policy applied beyond the contracting company's right to recover its deductible amount, because it allowed Zurich "to recover sums that are reimbursable under the endorsement and any Deductible Amount" and "there [was] no language in the relevant provisions that limits the assignment." *Id.* at *7.

Zurich argues that the *Wausau* holding is consistent with its interpretation of the Maxim Policy and that neither Pennsylvania nor Texas law conflicts with New York law on this issue. (Docket Entry No. 22 at 24; *id.* at 24 n.13). According to Zurich, "Maxim is in materially the same position as [the contracting company] in the *Wausau* case" because Maxim seeks to

recover the money it spent in an underlying case, including the deductible amounts spent on the settlement. (*Id.* at 25). Zurich points to language in the Deductible Endorsement that Maxim assigned to Zurich Maxim's right "to recover sums that are reimbursable under this endorsement and any Deductible Amount from anyone liable for the injury or damages." (*Id.*). Zurich reads this to mean that "Maxim's assignment results in only Zurich being able to pursue Maxim's claims against Zurich," because the "assignment should have the same results if Berkel was not represented by Zurich but by some other insurance company." (*Id.* at 26). "Because of its assignment of claims, Maxim cannot assert the claims it brings against Zurich. Zurich, the assignee of Maxim's claims, has never authorized Maxim to pursue the current lawsuit on Zurich's behalf or otherwise. Accordingly, Maxim has no authority or capacity to bring its claims." (*Id.* at 26).

Maxim responds that in *Wausau*, unlike this litigation, "Zurich actively pursued its subrogation rights" and that "*Wausau* involved two different insurers, rather than the same insurer . . . on both sides of the claim." (Docket Entry No. 25 at 19). Maxim also argues that the different applicable law in *Wausau* and this case has a substantive impact. "Zurich's self-interested decision not to pursue any subrogation rights that were allegedly assigned to it results in a waiver of those rights under Pennsylvania law." (*Id.* at 20 (citing *Valora ex rel. Valora v. Pa. Emps. Benefit Tr. Fund*, 847 A.2d 681, 685 (Pa. Super. Ct. 2004), *aff'd sub nom.*, *Valora v. Pa. Emps. Benefit Tr. Fund*, 939 A.2d 312 (Pa. 2007))).

Maxim cites the Deductible Endorsement as well. (Docket Entry No. 25 at 15–16). Maxim argues that the Deductible Endorsement's assignment provision is triggered only when reimbursable costs are at issue. (*Id.* at 16–17). According to Maxim, Zurich's interpretation of the Deductible Endorsement conflates the terms "reimbursable" and "reimbursed," while the

Deductible Endorsement distinguishes "reimbursable" from "reimbursed" in outlining the process for allocating recoveries between Zurich and Maxim. (*Id.* at 17).

The Deductible Endorsement states that "the recovered amount will be first applied to any payments made by [Zurich] in excess of the Deductible Amount," and "[t]he remainder of the recovery, if any, will then be applied to reduce the Deductible Amount reimbursed or reimbursable by [Maxim] as respects that injury or damage." (Docket Entry No. 19-1 at 673). Maxim explains that it already reimbursed Zurich for the settlement and defense costs in the underlying lawsuit, the same amount Maxim now seeks under the Berkel Policy. While Maxim admits that it assigned Zurich Maxim's right to recover reimbursable amounts, Maxim argues that it did not assign the right to recover "amounts that Maxim has actually reimbursed to Zurich." (Docket Entry No. 25 at 17 (emphasis omitted)). According to Maxim, this "is the only logical construction . . . because Zurich would have no right to seek recovery from third parties for losses Maxim (and not Zurich) actually incurred." (*Id.*). Maxim argues that because Zurich is entitled to reimbursement and recovery from liable third parties, "[i]t would be ludicrous for Zurich to be able to prevent Maxim from recovering money from a liable insurer" like Zurich, noting that "Zurich has self-interested reasons for declining to exercise those rights as to its small portion of the Lee settlement." (Docket Entry No. 25 at 16).

Zurich replies that Maxim's distinction between "reimbursable" and "reimbursed" in interpreting the Deductible Endorsement "reads into the contract a limitation that would disallow Zurich from seeking recovery of any reimbursable amount that has been reimbursed." (Docket Entry No. 29 at 5). Zurich argues that this reading would "negate and render meaningless the specific reference to the Deductible Amount in the assignment" and would "add[] language to the contract that is not there." (*Id.*). According to Zurich, Pennsylvania law prohibits that

interpretation.  (*Id.*).  Zurich reads the requirement that "[t]he remainder of the recovery, if any will then be applied to reduce the Deductible Amount reimbursed or reimbursable" to mean that Zurich may recover more than "unreimbursed" reimbursable amounts, but all reimbursable amounts, even if already reimbursed.  (*Id.*)

Maxim's interpretation is the reasonable one.  The Deductible Endorsement states that Zurich has the exclusive right to recover costs "that are reimbursable," not those already reimbursed.  (Docket Entry No. 19-1 at 673).  Under Pennsylvania law, the "rules of construction do not permit words in a contract to be treated as surplusage . . . if any reasonable meaning consistent with the other parts can be given to it."  *Clarke v. MMG Ins. Co.*, 100 A.3d 271, 276 (Pa. Super. Ct. 2014) (alteration in original) (quoting *Tenos v. State Farm Ins. Co.*, 716 A.2d 626, 631 (Pa. Super. 1998)).  As Maxim points out, the Deductible Endorsement implies a distinction between reimbursed and reimbursable costs in noting that recovered amounts apply "to reduce the Deductible Amount reimbursed or reimbursable by [Maxim] as respects that injury or damage."  (*Id.* at 673).

There is a distinction between "reimbursed" and "reimbursable" in the Maxim Policy. While *Wausau* has some similarities to this case, the factual differences that the insured in *Wausau* had not yet reimbursed Zurich, but was instead seeking coverage for reimbursable (and not reimbursed) amounts from a different insurer make it unhelpful as persuasive precedent.  Zurich's critique of Maxim's interpretation of the Deductible Endorsement's explanation of how recovered payments will be allocated also overstates the implications of Maxim's reading.  To find that the Maxim Policy distinguishes between "reimbursed" and "reimbursable" amounts in stating that "[t]he remainder of the recovery, if any, will then be applied to the Deductible Amount reimbursed

or reimbursable" does not mean, as Zurich argues, that it could never recover reimbursable costs, even if not reimbursed.

Under the Maxim Policy, Maxim must reimburse Zurich for defense costs and the first $3 million of any settlement or judgment. (Docket Entry No. 19-1 at 673). Maxim has reimbursed Zurich for those costs in the underlying lawsuit. Under the most logical reading of the Policy, Zurich may recover "reimbursable" amounts, but it is not assigned the right to also seek recovery from other sources of amounts that the insured has already reimbursed to Zurich.

Alternatively, the parties' different interpretations show that the Deductible Endorsement is ambiguous with respect to whether only Zurich may assert claims for reimbursable funds. To the extent that there is ambiguity about whether an insured can seek recovery of reimbursable costs from another party, any ambiguity "is generally construed against the insurance company as the drafter of the agreement" and "policy exclusions are to be construed narrowly in favor of coverage." *Mut. Benefit Ins. Co. v. Politsopoulos*, 115 A.3d 844, 852 n.6 (Pa. 2015). The Deductible Endorsement does not take away Maxim's standing to pursue this claim against Zurich under the Berkel Policy. Because the Maxim Policy does not assign Maxim's rights exclusively to Zurich, Maxim has standing to pursue its claim against Zurich.[1]

---

[1] Maxim looks beyond the Maxim Policy language to argue that Zurich's assertion that Maxim lacks standing is precluded by the unclean-hands doctrine. Maxim argues Zurich has not performed its duty under the policy in good faith. (Docket Entry No. 25 at 18). Because the court concludes that the Policy does not deprive Maxim of standing, it does not consider these arguments.

Zurich also argues that if the court finds that Maxim has standing to pursue its claims, "Zurich remains entitled to a reimbursement" or a "setoff for any and all reimbursable amounts paid by Zurich to Maxim under the Maxim CGL Policy that have not [been] previously reimbursed to Zurich by Maxim." (Docket Entry No. 22 at 26–27). Because, as discussed below, the court concludes that Texas law bars Maxim's recovery, this argument need not be addressed.

## V.     The Texas Anti-Indemnity Statute

### A.     Background

The Texas Anti-Indemnity Statute applies to "a construction contract for a construction project" in which an indemnitor gives or procures insurance. TEX. INS. CODE § 151.101; *see id.* §§ 151.001–151.151. The Statute makes indemnity agreements and similar liability-shifting agreements void under certain circumstances. *Id.* The key provision, § 151.102, states:

> Except as provided by Section 151.103, a provision in a construction contract, or in an agreement collateral to or affecting a construction contract, is void and unenforceable as against public policy to the extent that it requires an indemnitor to indemnify, hold harmless, or defend a party, including a third party, against a claim caused by the negligence or fault, the breach or violation of a statute, ordinance, governmental regulation, standard, or rule, or the breach of contract of the indemnitee, its agent or employee, or any third party under the control or supervision of the indemnitee, other than the indemnitor or its agent, employee, or subcontractor of any tier.

*Id.* § 151.102. This section allows a party to indemnify another in limited circumstances, but it disallows indemnification for claims caused by the party seeking indemnification. *Id.*

The Statute also limits allowable additional-insured coverage in construction contracts. Additional-insured coverage is void "to the extent that it requires or provides coverage the scope of which is prohibited under this subchapter for an agreement to indemnify, hold harmless, or defend." *Id.* § 151.104(a). While the Statute does not define an "indemnitee," it does define an "indemnitor" as "a party to a construction contract that is required to provide indemnification or additional insured status to another party to the construction contract or to a third party." *Id.* § 151.001(6).

Section 151.102's broad rule making indemnity agreements in construction contracts void is limited. It:

> does not apply to a provision in a construction contract that requires a person to indemnify, hold harmless, or defend another party to the construction contract or a

13

third party against a claim for the bodily injury or death of an employee of the indemnitor, its agent, or its subcontractor of any tier.

*Id.* § 151.103. If the claim against the indemnitee arises out of a physical injury to the indemnitor's employee, then the agreement still operates to require the indemnitor to indemnify the indemnitee for that claim. *Id.* The Statute states that it "does not affect . . . the benefits and protections under the workers' compensation laws of this state." *Id.* § 151.105(5).[2]

Reading these sections together, the Anti-Indemnity Statute prohibits additional-insured coverage when the insurance contract requires the insuring party to provide coverage of a claim caused by the Additional Insured's "negligence or fault, the breach or violation of a statute, ordinance, governmental regulation, standard, or rule, or the breach of contract of the indemnitee," or those of the additional-insured's agent, employee, or third party under its control or supervision. *Id.* § 151.102. The Statute does not prohibit coverage in one of these scenarios if the claim is brought by the party providing the additional-insured coverage, or by its agent, employee, or subcontractor.

Under Berkel's Lease Agreement with Maxim, Berkel had to name Maxim as an Additional Insured in the Berkel Policy. Berkel was required to provide:

> comprehensive general liability insurance, including contractual liability, protecting against liability for property damage and personal injury or death arising out of the possession, use, operation, maintenance and repair of the Equipment, with limits of liability not less than $2,000,000 each occurrence; and a $2,000,000 general aggregate.

---

[2] The Statute went into effect in 2012. Few courts have reviewed it. *See, e.g.*, *Union Pac. R.R. Co. v. Brown*, No. 04-17-00788-CV, 2018 WL 6624507 (Tex. App.—San Antonio Dec. 19, 2018, no pet. h.) (mem. op.); *Beazley Ins. Co. v. Eaton Corp.*, No. 5:16-CV-1255-OLG, 2017 WL 9362564, at *2 (W.D. Tex. Nov. 17, 2017); *United States of Am. for the Use & Benefit of E J Smith Constr. Co. v. Travelers Cas. & Sur. Co.*, No. 5:15-CV-971-RP, 2016 WL 1030154, at *6 (W.D. Tex. Mar. 10, 2016); *United States of Am. for the Use & Benefit of EJ Smith Constr., Co. v. Travelers Cas. & Sur. Co.*, W-14-CV-427, 2015 WL 12734070, at *1 (W.D. Tex. June 25, 2015); *Maxim Crane Works L.P.*, 2016 WL 4198138, at *2.

(Docket Entry No. 19-1 at 515). That insurance was "deemed primary, non-contributory insurance of [Maxim]" and had to "name [Maxim] as an additional insured party . . . and loss payee." *Id.* This additional-insured provision applied regardless of fault. (*See id.*).

The undisputed facts show that the Anti-Indemnity Statute applies to Berkel's and Maxim's Lease Agreement and to the Berkel Policy's designation of Maxim as an additional insured. Berkel and Maxim entered into the Lease Agreement because Berkel, a project subcontractor, leased a crane from Maxim to construct "a building, structure, appurtenance, or other improvement to or on public or private real property" that was not for "a single family house townhouse, [or] duplex." TEX. INS. CODE §§ 151.001(2), 151.001(5), 151.101. The underlying lawsuit alleged that Maxim was independently liable for its own negligence, not for any negligence of Berkel. (*See* Docket Entry No. 19-1 at 742–88). Unless an exception applies, the Statute voids the additional-insured coverage because that coverage requires the Berkel Policy to cover Maxim "against a claim caused by [Maxim's] negligence or fault." TEX. INS. CODE §§ 151.102, 151.001(6).

## B. Interpreting the Statute

Both parties suggest that, absent an exception, the Anti-Indemnity Statute prohibits the Berkel Policy from covering Maxim's costs arising from the underlying litigation. (*See* Docket Entry No. 20 at 19–20; Docket Entry No. 22 at 31). Whether an exception applies requires the court to interpret the Statute. The parties debate the approach the court should take.

Texas law and the law of most states requires courts to begin with the plain language. *See Leland v. Brandal*, 257 S.W.3d 204, 206 (Tex. 2008) (quoting *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999)). A court must "use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired." *City of Rockwall v. Hughes,* 246 S.W.3d 621, 625 (Tex. 2008) (citing TEX. GOV'T CODE § 311.011(b)).

If the "statutory language is susceptible to more than one reasonable interpretation," then the court "look[s] beyond its language for clues to the Legislature's intended meaning." *In re Smith*, 333 S.W.3d 582, 586 (Tex. 2011); *see also* TEX. GOV'T CODE § 312.005 ("In interpreting a statute, a court shall diligently attempt to ascertain legislative intent and shall consider at all times the old law, the evil, and the remedy.").

Maxim urges the court to consider the legislative history of the Anti-Indemnity Statute, which Maxim characterizes as a recent change to address "the disparity in bargaining power between upper-tier contractors and lower-tier subcontractors." (Docket Entry No. 20 at 15 (citing Taylor R. Beaver, *The Texas Anti-Indemnity Act*, 45 ST. MARY'S L.J. 535, 538 (2014))). According to Maxim, the Statute "must be considered in light of decades of well-established Texas common law that allowed broad indemnification, including for one's own negligence." (*Id.* at 16). Maxim contends that the Statute has significant ambiguities, which require the court to consider legislative intent and to "liberally construe[ the law] to achieve [its] purpose and to promote justice. (*Id.* at 18 (quoting TEX. GOV'T CODE § 312.006(a))). Maxim argues that the Statute's exceptions show that "the [Texas] legislature plainly intended to restrict the scope of the anti-indemnity provisions, permitting indemnification in a variety of situations." (Docket Entry No. 20 at 19). According to Maxim, these situations include "indemnification for personal injuries to employees protected under the Texas workers' compensation regime." (*Id.*).

Zurich emphasizes that Texas law requires "first looking to the statutory language for the Legislature's intent, and only if [the court] cannot discern legislative intent in the language of the statute itself," is the court allowed to consider "canons of construction" and policy concerns. (Docket Entry No. 26 at 8 (quoting *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 353 S.W.3d 628, 638–39 (Tex. 2010))). Zurich argues that Maxim gives "an improper analysis of

statutory construction" that suggests first "look[ing] past the plain language of the Texas Anti-Indemnity Statute and the Texas Workers' Compensation Act" to consider evidence of legislative intent by, in part, looking at the common law that those statutes replaced.  (*Id.* at 9).

Zurich is correct insofar as it outlines the steps a court must use to analyze the two Texas laws at the heart of this dispute.  A court's primary objective in construing a Texas statute is "to ascertain and give effect to the Legislature's intent."  *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) (citing TEX. GOV'T CODE § 312.005).  "To discern that intent, we begin with the statute's words," and "[i]f a statute uses a term with a particular meaning or assigns a particular meaning to a term, we are bound by the statutory usage."  *Id.* (citing TEX. GOV'T CODE § 312.003; *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002)).  Undefined terms are given their ordinary meaning unless context dictates otherwise.  A court must "consider statutes as a whole rather than their isolated provisions."  *Id.* (quoting *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004)).

### C.     The Employee Exception

The Texas Anti-Indemnity Statute's Employee Exception states that the general prohibition against indemnification in construction contracts does not apply to a construction contract requiring indemnification "against a claim for the bodily injury or death of an employee of the indemnitor, its agent, or its subcontractor of any tier."  TEX. INS. CODE § 151.105(5).  Maxim argues that the Employee Exception applies to Lee's claims against Maxim because Maxim was expressly covered under the Berkel Policy, which covered injuries to Berkel's employees caused by Maxim's negligence.  (Docket Entry No. 20 at 13).  Maxim argues that because Berkel "has

been deemed to be the functional equivalent of Lee's employer," the Berkel Policy covers Maxim's defense against, and settlement with, Lee. (*Id.*).

Zurich responds that Berkel was deemed only Lee's "coemployee," not his employer. (Docket Entry No. 26 at 7). Zurich asserts that neither the Texas Workers' Compensation Act, which was the basis for the state court's finding that Berkel was a statutory "coemployee," nor the Anti-Indemnity Statute allows Berkel to be considered Lee's employer. (*Id.* at 12–15; Docket Entry No. 22 at 34–37). Because Lee was not a Berkel employee, "co" or otherwise, outside the narrow context of the Workers' Compensation Act, Zurich argues that Maxim cannot take advantage of the Anti-Indemnity Statute Employee Exception. (Docket Entry No. 22 at 31; Docket Entry No. 26 at 10).

One issue is whether the Texas appellate court's conclusion in the underlying litigation that Berkel was Lee's statutory "coemployee" under the Texas Workers' Compensation Act was the same as concluding that Berkel was Lee's statutory "coemployer." A second issue is whether, if Berkel was Lee's "coemployer," Lee's claim against Maxim was "a claim for the bodily injury or death of an employee of the indemnitor." If Maxim wins both arguments, it can take advantage of the Employee Exception under the Texas Anti-Indemnity Statute and has coverage under the Berkel Policy.

### 1. "Coemployee" and "Coemployer" Under the Texas Workers' Compensation Act

Maxim and Zurich agree that Lee was a Skanska employee in 2013. (Docket Entry No. 19 at ¶ 12). Berkel appealed from the underlying lawsuit judgment. The Texas court of appeals concluded that Berkel was Lee's coemployee and Skanska's employee under the Act. The court explained that because of this coemployee status, Berkel was "immune from suit under the 'exclusive remedy' provision of [that Act]." (Docket Entry No. 20 at 21–22 (citing TEX. LAB.

CODE § 408.001(a); *Berkel v. Lee*, 543 S.W.3d at 296); Docket Entry No. 19-4 at 114). The Texas

court of appeals did not state that Berkel was Lee's employer or that Berkel was Lee's

"coemployer" with Skanska. Maxim and Zurich debate whether, under the Workers'

Compensation Act, Berkel's "coemployee" status with Lee also makes Berkel a "coemployer" of

Lee.

Under the Texas Workers' Compensation Act, an employer is "a person who makes a

contract for hire, employs one or more employees, and has workers' compensation coverage."

TEX. LAB. CODE § 401.012. An employee is a "person in the service of another under a contract

for hire, whether express or implied, or oral or written," and includes:

> (1) an employee employed in the usual course and scope of the employer's business
> who is directed by the employer temporarily to perform services outside the usual
> course and scope of the employer's business;
>
> (2) a person, other than an independent contractor or the employee of an
> independent contractor, who is engaged in construction, remodeling, or repair work
> for the employer at the premises of the employer; and
>
> (3) a person who is a trainee under the Texans Work program established under
> Chapter 308.

TEX. LAB. CODE § 401.012.

Under these definitions, Lee was not Berkel's employee, nor was Berkel Lee's employer.

Maxim has not offered or identified record evidence that Berkel directed Lee to perform services,

that Lee worked at Berkel's premises, that Lee was Berkel's trainee, or that Berkel had a contract

with, employed, or provided workers' compensation coverage, to Lee.

Section 406.123 of the Texas Workers' Compensation Act provides that in certain

circumstances, a general contractor may be deemed the statutory employer of a subcontractor and

the subcontractors' employees. TEX. LAB. CODE § 406.123. If a general contractor and a

subcontractor have a written contract for the general contractor to "provide[] workers'

compensation insurance coverage to the subcontractor and the employees of the subcontractor," that contract "makes the general contractor the employer of the subcontractor and the subcontractor's employees." *Id.* § 406.123(a), (e). But this statutory relationship exists "only for the purposes of the workers' compensation laws of this state." *Id.* § 406.123(e).

Maxim argues that the Texas appellate court's conclusion that Berkel was Lee's coemployee under § 406.123 was "functionally identical to a determination that Berkel was Lee's employer," because Berkel was found to be immune under the Texas Workers' Compensation Act. (Docket Entry No. 20 at 22). According to Maxim, the "co-employee" versus "co-employer" labels are interchangeable. Maxim points to state-court cases that have used both labels to refer to the same relationships among tiers of contractors under insurance programs. (*Id.* at 22 (citing *Austin Bridge & Road, LP v. Suarez*, 556 S.W.3d 363, 387 (Tex. App.—Houston [1st Dist.] 2018, pet. filed)). Zurich responds that while the Act acknowledges that "a statutory 'co-*employer*' relationship [may be] created between the general contractor and the subcontractor with relation to the *subcontractor's and sub-subcontractor's* employees," it does not give "authority for a subcontractor to become a deemed employer of the general contractor's employees." (Docket Entry No. 26 at 14 (emphasis in original)).

Maxim relies on *Austin Bridge & Road, LP v. Suarez*, 556 S.W.3d 363 (Tex. App.—Houston. [1st Dist.] 2018, pet. filed), to argue the interchangeability of "coemployer" and "coemployee." (Docket Entry No. 20 at 22). Maxim asserts that the *Austin Bridge* court used "the terms co-employer and co-employee interchangeably and conclude[d] that 'because Austin Bridge can be considered a deemed co-employer *or* co-employee of Derr & Isbell, it is entitled to the benefit of the [Texas Workers' Compensation Act's] exclusive remedy defense.'" (*Id.* (emphasis in original)).

In *Austin Bridge*, Baylor University owned the worksite of a construction project and maintained an owner-controlled insurance program that covered the project's general contractor, subcontractors, and sub-subcontractors. *Austin Bridge*, 556 S.W.3d at 369–70. Baylor University hired Austin Commercial as the general contractor. *Id.* at 369. Austin Commercial subcontracted with its subsidiary, Austin Bridge, and Austin Bridge sub-subcontracted with Derr & Isbell. *Id.* at 371. Austin Commercial, Austin Bridge, and Derr & Isbell were each enrolled in Baylor's owner-controlled insurance program. *Id.* at 371–73. A Derr & Isbell employee died while working on the project. *Id.* at 369. His family sued Austin Commercial, Austin Bridge, and Derr & Isbell for negligence and gross negligence. *Id.* at 374. Austin Bridge moved for summary judgment on the basis that it was the statutory employer of the Derr & Isbell employee, because the project was insured under the Baylor University insurance program. *Id.* The trial court denied the motion, a jury found Austin Bridge 100% liable, and Austin Bridge appealed. *Id.*

The Texas appellate court acknowledged that § 406.123 can make a general contractor the "statutory 'employer' of [a] subcontractor and its employees for purposes of applying the exclusive-remedy provision of the [Texas Workers' Compensation Act]." *Id.* at 377. In examining cases interpreting the Act, the court explained that there are situations in which a contractor may be simultaneously both a coemployer and a coemployee under § 406.123. *See id.* at 386. A "deemed employer/employee relationship [may] extend[] throughout all tiers of subcontractors when the general contractor has purchased workers' compensation insurance that covers all workers on the site." *Id.* (citing *Etie v. Walsh & Albert Co.*, 135 S.W.3d 764, 768 (Tex. App.—Houston [1st Dist.] 2004, pet. denied)). Because Baylor University's written agreement with Austin Commercial to provide workers' compensation insurance coverage was "expressly

incorporated into the lower-tier contracts, the [Act's] deemed employer/employee relationship extended throughout all tiers of Subcontractors in the Project." *Id.*

Maxim stretches the *Austin Bridge* court's interpretation of § 406.123. The court's conclusion that Austin Bridge was "a deemed co-employee/co-employer" does not make the terms interchangeable. The specific contractual relationships among the parties were critical. Austin Bridge was its subcontrator's coemployer by virtue of its contract with Austin Commercial, which incorporated the provision in Austin Commercial's contract with Baylor University that required enrollment in the owner-controlled insurance program that included workers' compensation coverage. *See id.* at 386. Austin Bridge was also a coemployee with Derr & Isbell because Austin Bridge's contract with Derr & Isbell incorporated the requirement that the subcontractor enroll in the owner-controlled insurance program. *See id.* The injured employee was the employee of the lowest-tiered subcontractor, and the contractual requirement for workers' compensation benefits was incorporated into the contracts down the tiers of subcontractors.

In contrast to *Austin Bridge*, the injured employee here is not the employee of the lowest-tiered subcontractor, Berkel. Instead, Lee was the employee of the general contractor, Skanska. (*See* Docket Entry No. 19 at ¶ 12). Skanska subcontracted with Berkel. That subcontract required Berkel to enroll in Skanska's contractor-controlled insurance program. (*Id.* at ¶¶ 4–5). Because Berkel enrolled, Berkel can be Skanska's deemed employee under § 406.123(e). TEX. LAB. CODE § 406.123(a), (e). It was that status that led the Texas court of appeals to conclude that Berkel was Lee's coemployee. *See Berkel & Co. Contractors, Inc. v. Lee*, 543 S.W.3d 288, 296 (Tex. App—Houston [14th Dist.] 2017, pet. filed). Unlike in *Austin Bridge*, in this case, there was no straight line through the subcontracting tiers from Berkel to Lee that would support Maxim's claim that Berkel was Lee's coemployer.

A survey of cases in which Texas courts have found subcontractors to be deemed coemployers of workers suggests that Berkel cannot be Lee's coemployer under § 406.123(e).  To have that status, Lee would have to be either Berkel's actual employee or employed by a Berkel subcontractor enrolled in the contractor-controlled insurance program.  *See, e.g.*, *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74, 78 (Tex. 2016) (a lower-tier subcontractor was a coemployee of an injured worker because the worker's employer agreed in writing to provide worker's compensation insurance to the subcontractor); *Austin Bridge*, 556 S.W.3d at 386.  Instead, Lee was the employee of a higher-tiered contractor.  (*See* Docket Entry No. 19 at ¶ 12).  Maxim has not identified, and the court has not found, a case in which a lower-tiered subcontractor is deemed under § 406.123(e) to be the statutory employer of a higher-tiered contractor's employee.  In sum, the statutory language and the Texas cases interpreting that language show that the terms "coemployer" and "coemployee" are not interchangeable and that the court cannot deem Berkel to be Lee's coemployer.

### 2.     Whether "Coemployer" Status Can Be Imported to the Texas Anti-Indemnity Statute

Even if Maxim succeed in arguing that Berkel was also Lee's statutory "coemployer," the question remains whether an employee of a deemed "coemployer" under the Texas Workers' Compensation Act is also deemed an employee under the Texas Anti-Indemnity Statute.  The Employee Exception under the Statute states that the general rule against indemnification for an indemnitee's own negligence "does not apply to a provision . . . that requires a person to indemnify . . . another party to the construction contract or a third party against a claim for the bodily injury or death of an employee of the indemnitor, its agent, or its subcontractor of any tier."  TEX. INS. CODE § 151.103.

Maxim does not address whether "coemployer" or "coemployee" status can be imported to the Texas Anti-Indemnity Statute. Instead, Maxim appears to assume that once a subcontractor is deemed a "coemployer" of a worker under the Texas Workers' Compensation Act, the subcontractor is also then a coemployer under the Texas Anti-Indemnity Statute as well. (*See* Docket Entry No. 20 at 22–23; Docket Entry No. 31 at 8). Zurich responds that "even if [the Texas Workers' Compensation Act] deemed Berkel the statutory employer of Lee, such status would be limited to workers' compensation laws and would not extend to other statutes such as the Texas Anti-Indemnity Statute." (Docket Entry No. 26 at 7). Maxim argues that "the Texas legislature intended the [Workers' Compensation Act] and the [Anti-Indemnity Statute] to work together," pointing to the Workers' Compensation Exclusion in the Anti-Indemnity Statute. (Docket Entry No. 25 at 22 (citing TEX. INS. CODE § 151.105(5))).

The Texas Workers' Compensation Act has a qualifier in § 406.123, the section stating that "the general contractor shall be treated as the employer of the subcontractor" under specific circumstances. The qualifier states "[a]n agreement under this section makes the general contractor the employer of the subcontractor and the subcontractor's employees only for purposes of the workers' compensation laws of this state." TEX. LAB. CODE § 406.123(e). This language supports Zurich's interpretation that "coemployer" and "coemployee" status are limited to laws specifically concerning workers' compensation. Neither party argues that the Texas Anti-Indemnity Statute is a workers' compensation law. While Maxim is correct that the Anti-Indemnity Statute provides that it "does not affect . . . the benefits and protections under the workers' compensation laws of this state," that language sets the Statute apart from workers' compensation laws.

Neither party has pointed to cases applying deemed "coemployees" or "coemployers" outside the Workers' Compensation Act. Other Texas laws use different definitions of "employee," suggesting that "coemployee" status is not universal across Texas law. *See* TEX. CIV. PRAC. & REM. CODE § 101.001 (defining "employee"); TEX. HEALTH & SAFETY CODE § 312.007(a) (same).

Because the Texas Workers' Compensation Act supports finding the terms "coemployer" or "coemployee" apply only to that context, and because Maxim has not offered a persuasive argument or precedent supporting the exportation of that status to the Anti-Indemnity Statute, Maxim has not succeeded in showing that, if Berkel is Lee's "coemployer," it would also be Lee's coemployer under the Anti-Indemnity Statute. Without that connection, Maxim's argument that the Employee Exception in the Anti-Indemnity Statute applies to Lee's claims against Maxim fails.

### D.     The Workers' Compensation Exception

The Workers' Compensation Exclusion is a second exception to the Texas Anti-Indemnity Statute's broad prohibition against indemnification in construction contracts for an indemnitee's own negligence. The Statute excludes from its coverage agreements that affect "the benefits and protections under the workers' compensation laws of this state." TEX. INS. CODE § 151.105(5). It appears that no court has yet construed this section.

Maxim argues that the Act's Workers' Compensation Exclusion requires Zurich to cover its claims and "provid[es] an independent basis for concluding that [the Act] does not void Maxim's coverage as an Additional Insured under the Berkel CGL Policy." (Docket Entry No. 20 at 24). According to Maxim, the exclusion is meant "to allow full indemnification (and insurance for such indemnification) for claims arising from third-party over actions, like the Lee Suit, where workers' compensation is available to the injured party." (Docket Entry No. 20 at 24). Maxim

contends that because "Lee and Berkel received benefits and protections under the [Texas Workers' Compensation Act]," full indemnification is proper here. (Docket Entry No. 20 at 24).

Zurich responds that the exclusion is inapplicable because it "applies solely to the benefits and protections under Texas's workers' compensation laws," and because "Maxim has not shown any benefit or protection that is affected by the application of the Texas Anti-Indemnity Statute" because both Lee and Berkel have received the benefits of the Texas Workers' Compensation Act. (Docket Entry No. 26 at 20). Zurich argues that Maxim's interpretation of the Workers' Compensation Exclusion would make it "superfluous and meaningless" because it would be "redundant" with the Employee Exception. (*Id.* at 20–21). According to Zurich, the Employee Exception is meant to "eliminat[e] liability and coverage disputes between [defendants] and streamlin[e] personal injury suits." (*Id.* at 21). The goal is to protect workers, not third parties that might be sued.

The lack of legislative history, case law, and secondary sources discussing the Anti-Indemnity Statute make this or any purposive reading of this section difficult. *See* Beaver, 45 ST. MARY'S L.J. at 538 n.21 ("There is little legislative intent or history on this Act, as is typical in Texas. The only statement of intent given concerns the duration of insurance programs currently in place, in that there is no requirement as to how long a contractor must maintain insurance for a given construction contract." (citing House Comm. on Insurance, Bill Analysis, Tex. H.B. 2093, 82d Leg., R.S. 1 (2011), http:// www.lrl.state.tx.us/scanned/srcBillAnalyses/82-0/HB2093ENG.pdf)); *see also id.* at 546 ("[A] complete lack of clarity in drafting the statute and lack of legislative intent leaves courts to decipher what the statute in fact covers."). The parties' arguments on how to read the law based on legislative intent are largely unsupported.

The statutory language itself shows that the court need not try to decipher the few clues about the legislators' intent. The Statute states that it is not meant to affect "the benefits and protections under the workers' compensation laws." TEX. INS. CODE § 151.105(5). A party seeking to avoid the Statute must identify some preexisting workers' compensation benefit or protection under Texas law and explain how making the indemnification agreement void would affect that benefit or protection.

Maxim has not identified a preexisting benefit or protection that the Anti-Indemnity Statute would undermine or vitiate here. Maxim argues only that "[t]his case is deeply intertwined with workers' compensation" because "Berkel received the protection of immunity under the [Texas Workers' Compensation Act], and Lee received the benefit of workers' compensation payments." (Docket Entry No. 31 at 10). But applying the Statute to relieve Zurich of the obligation to indemnify Maxim would not affect a benefit or protection of the Texas workers' compensation laws. Lee would have, and did, receive his workers' compensation benefits in any event. Maxim has not explained how a ruling for Zurich would alter or substantively impact that result.

Because Maxim has not shown that applying the Anti-Indemnity Statute would affect a benefit or protection of the Texas workers' compensation laws, the Workers' Compensation Exclusion does not apply to Maxim's claims for coverage under the Berkel Policy, entitling Zurich to summary judgment.

## VI. The Berkel Policy

Because the court concludes that the Texas Anti-Indemnity Act voids Maxim's Additional-Insured coverage under the Berkel Policy for the damages and losses in the underlying litigation, the court need not address whether the Berkel Policy precludes or limits Maxim's recovery.

# VII. Conclusion

The court grants Zurich's summary judgment motion, (Docket Entry No. 22), and denies

Maxim's summary judgment motion, (Docket Entry No. 20). Final judgment is separately entered.

SIGNED on June 19, 2019, at Houston, Texas.

_____

Lee H. Rosenthal
Chief United States District Judge